UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JAMES A. WILLITTS, SR., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 20-cv-11255-ADB |
| ENGIE NORTH AMERICA INC., | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff James A. Willitts, Sr. ("Willitts"), who is proceeding *pro se*, brings this action against his former employer, Defendant Engie North America Inc. ("ENGIE"). [ECF No. 14 ("Am. Compl.")].  Plaintiff's remaining claim alleges that ENGIE discriminated against him based on his disabilities, in violation of the Americans with Disabilities Act ("ADA").  [Id.]. Currently before the Court is ENGIE's motion for summary judgment, [ECF No. 165], which, as more fully set forth below, is GRANTED.

## I.      BACKGROUND

### A.      Local Rule 56.1

As a preliminary issue, ENGIE argues that the facts in its statement of undisputed material facts, [ECF No. 167 ("SOF")], should be deemed admitted in their entirety because Willitts did not file a concise statement of disputed material facts, as required by Local Rule 56.1.  [ECF No. 174 at 2].  Willitts, in his opposition, did not directly respond to ENGIE's SOF, but instead included his own characterization of facts in his brief, sometimes with citations to exhibits attached to an affidavit.  See generally [ECF Nos. 173, 173-1].  These exhibits include

his deposition, [ECF Nos. 173-28, 173-29], and documents that appear to have been produced during discovery.  Some of the documents have handwritten annotations or include typed factual summaries, that appear to have been drafted by Willitts.  See, e.g., [ECF Nos. 173-2, 173-7].  Willitts also included, as separate exhibits, typed summaries of various events, many related to alleged safety issues.  See, e.g., [ECF Nos. 173-17, 173-20].  Willitts also filed a sur-reply, with a section entitled "Background facts Relating to Plaintiff's Claims of this Action" that includes some discussion of facts, but again largely does not directly respond to ENGIE's SOF.  [ECF No. 176 at 5–9].

Local Rule 56.1 provides that "[a] party opposing [a] motion [for summary judgment] shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation."  L.R. 56.1.  "[This rule] was adopted to expedite the process of determining which facts are genuinely in dispute, so that the court may turn quickly to the usually more difficult task of determining whether the disputed issues are material."  Brown v. Armstrong, 957 F. Supp. 1293, 1297 (D. Mass. 1997), aff'd, 129 F.3d 1252 (1st Cir. 1997) (unpublished table decision).

"Where a party opposing a motion for summary judgment fails to comply with Local Rule 56.1, the court has the discretion to decide whether to impose the sanction of deeming the moving party's factual assertions to be admitted."  Butters v. Wells Fargo Advisors, LLC, No. 10-cv-10072, 2012 WL 5959986, at *2 (D. Mass. Nov. 27, 2012) (citing Swallow v. Fetzer Vineyards, 46 F. App'x 636, 638–39 (1st Cir. 2002)) (further citation omitted); see also Summers v. City of Fitchburg, 940 F.3d 133, 138 (1st Cir. 2019) ("Here, the [non-moving party] flouted Local Rule 56.1 and allowed the [the moving party] to map the boundaries of the

summary judgment record.  Such actions have consequences, and the district court deemed the [moving party's] statement of undisputed material facts admitted.  Given the clarity of Local Rule 56.1 and the important function that it serves, the district court was fully justified in limiting the summary judgment record to the four corners of the [moving party's] statement of undisputed material facts." (first citing United States v. McNicol, 829 F.3d 77, 80–81 (1st Cir. 2016) and then citing Schiffmann v. United States, 811 F.3d 519, 524–25 (1st Cir. 2016))).

Courts, however, "are solicitous of the obstacles that pro se litigants face, and while such litigants are not exempt from procedural rules, we hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects." Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir. 2008) (citations omitted).  Nonetheless, "self-representation is not 'a license not to comply with relevant rules of procedural and substantive law.'" Andrews v. Bechtel Power Corp., 780 F.2d 124, 140 (1st Cir. 1985) (citation omitted).  "Thus, the Court will consider a pro se movant's circumstances when reviewing his motion for summary judgment but will not provide 'extra procedural swaddling.'" Grossman v. Martin, 566 F. Supp. 3d 136, 143 (D.R.I. 2021) (quoting Eagle Eye Fishing Corp. v. U.S. Dep't of Com., 20 F.3d 503, 506 (1st Cir. 1994)).

Willitts failed to comply with Local Rule 56.1 by not filing a counterstatement of material facts in accordance with Local Rule 56.1 or otherwise assisting the Court in determining which facts are genuinely in dispute.  Consequently, the portions of ENGIE's SOF that Willitts did not specifically controvert with support in the record are deemed admitted.

## B.  Material Facts

Unless otherwise noted, the following facts are admitted as uncontroverted pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, and then stated in the light most favorable to Willitts, the non-movant.

i.     Willitts' Position with ENGIE

In April 2014, Willitts started working for ENGIE at the Pinetree Power Fitchburg Biomass Generating Plant (the "Plant") as an Equipment Operator.  [SOF ¶ 1; Am. Compl. at 1]. In this position, Willitts' responsibilities included operating and maintaining a steam boiler and auxiliary steam equipment that generated electricity, which was then delivered to power companies.  [SOF ¶ 3].  This position required working with "dangerous high voltage equipment" and the ability to "respond to emergency situations that arise in the workplace."  [Id. ¶ 4].

ii.     Willitts' Disclosure of His Health Condition

In February or March 2016, Willitts informed Plant Operations Manager Scott Manning ("Manning") that he had attention-deficit/hyperactivity disorder ("ADHD") and took medication for the condition.  [SOF ¶ 5].  This communication occurred during a "casual" conversation. [Id.].  Willitts did not have any other conversations with Manning about his disability.  [Id. ¶ 6].

Sometime after Willitts disclosed his disability to Manning, Willitts' former supervisor, Dennis Butler ("Butler"), told Willitts that Manning had asked him questions about Willitts' disabilities and that he had responded by telling Manning that he was not allowed to ask about that confidential information.  [SOF ¶ 49; ECF No. 168-1 (Excerpts of Willitts Dep.) at 234:10–24].  Butler also told Willitts that he believed Manning was trying to use Willitts' disabilities to question his performance and get him fired.  [SOF ¶ 49].

iii.     May 2016 Shift Realignment

On May 16, 2016, an email was sent to Willitts and other employees notifying them of an upcoming shift realignment.  [SOF ¶ 48]. The email indicated that Willitts would be paired with Mike O'Rourke ("O'Rourke").  [Id.].  The parties dispute what motivated this shift realignment.

Willitts made earlier requests to not work with O'Rourke on shifts, which were denied.  [ECF No. 173 ¶ 18].  At some point after becoming aware of the shift realignment, Willitts asked Manning that he not be placed on shift with O'Rourke.  [Id. ¶ 23].  Willitts explained to Manning that he could not work with O'Rourke because (1) Willitts had "zero trust in Mike O'Rourke's ability to properly and safely operate the plant" and (2) O'Rourke had "a mutual negative attitude" towards Willitts because Willitts "sp[oke] out against Mike O'Rourke's outrageous actions and failures to properly operate the plant."  [Id. ¶ 18].  Manning denied the request on or before May 24, 2016.  [Id. ¶ 23].[1]

    iv.   <u>Willitts' Performance and the September 9, 2016 Written Warning and Proposed Transfer</u>

In his 2015 Performance Appraisal, Willitts' supervisor, Butler, noted that Willitts had voiced concerns about how the Plant operated "on many a[n] occasion[.]"  [ECF No. 168-11 ("2015 Performance Appraisal") at 4].  He explained that Willitts' "suggestion[s], some warranted, some not, ha[ve] put his peers into some heated debates."  [SOF ¶ 12 (first alteration in original)]; <u>see also</u> [2015 Performance Appraisal at 4].  Butler stated that he was "sure" that

---

[1] Willitts makes a number of assertions related to why he was re-assigned to work with O'Rourke and why his requests not to work with O'Rourke were denied.  For example, he avers that his requests were denied "intentionally" to "[h]arm and [d]emote" him.  [ECF No. 173 ¶¶ 18, 23].  He also alleges that "Scott Manning worked quickly to make the shift changes to allow . . . plans that denied the Plaintiffs Accommodation or Modification to stay on his shift with Dennis Butler of over two(2) years."  [Id. ¶ 39].  Additionally, he states he was "denied his request for Accommodations or Modifications and forced to work on shift with Mike O'Rourke on May 24, 2016, knowing that this situation was going to have a very negative effect to the Plaintiff.  Mike Buckman, Scott Manning, and Mike O'Rourke worked together to Harm and Demote the Plaintiff."  [Id. ¶ 18].  Willitts has not provided any record support for these assertions and the Court finds that Willitts cannot competently testify about other ENGIE employees' intentions.  The Court therefore does not credit these allegations.  <u>See</u> <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 6 (1st Cir. 2003) (finding that the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation." (quoting <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990))).

"in time" "this will settle down."  [SOF ¶ 12; 2015 Performance Appraisal at 4].  He also noted

that Willitts had come from a "larger utility" with "a[n] unlimited and endless budget" and that

he had had "some trouble adjusting [to] a smaller and tighter run ship."  [2015 Performance

Appraisal at 4].  Butler concluded his comments by stating that ENGIE was "lucky to have

[Willitts'] experience at the plant" and that he "look[ed] forward to working with him in the

future."  [Id.].

The Performance Appraisal also graded Willitts' performance in various categories

related to: "Professional Skills and Accountability[,]" "Relationships and Communications[,]"

"Leadership[,]" and "Management Way[.]"  [2015 Performance Appraisal at 2–4].  Willitts

received "Meets Expectations" or "Exceeds Expectations" in all categories.  [Id.].  For "Overall

Appraisal," he received "Exceeds Expectations."  [Id. at 4].

Willitts did have some "heated debates" with colleagues and supervisors, and they would

sometimes "get angry" and "annoyed with [him]" when he would "complain about certain

things."  [SOF ¶¶ 13, 14].  Willitts would sometimes disagree with his supervisor and would

sometimes refuse to complete his supervisors' requests.  [Id. ¶ 15].  He also acknowledged that

he might "raise [his] voice" in a "heated moment," for example, if someone is "doing something

they are not supposed to be doing without a permit and the plant start[s] on fire[.]"  [Id. ¶ 17].

He further testified that he has a "strong questioning attitude."  [Id. ¶ 16].

On September 9, 2016, Willitts was issued a written warning.  [SOF ¶ 8].  The written

warning indicates that it came from O'Rourke and Manning.  [ECF No. 168-10 ("September 9,

2016 Written Warning")].  Butler was not involved in preparing or issuing the written warning.

[SOF ¶ 50].

The written warning includes the following statements pertaining to Willitts:

- "During my observations of the shifts it was determined that we needed shift realignment due to one shift struggling to meet our targets operationally and environmentally. It became evident that you were controlling the shift and overstepping the authority of your Unit Supervisor." [September 9, 2016 Written Warning].

- "At the end of May the shifts were realigned, you expressed concern with the realignment and presented an unsuitable attitude." [Id.].

- "You have become argumentative and second guessing all levels of supervision and management. Your morale is extremely poor and is affecting the entire operations group." [SOF ¶ 10].

- "Your current supervisor has brought to my attention, multiple times that he has requested you to perform tasks that are again second guessed, argued and debated." [Id.].

The written warning also "recommend[s]" that Willitts be "reassigned to another position at the plant indefinitely until these issues can be resolved." [September 9, 2016 Written Warning]. This proposed transfer would have been to another department referred to as the "Woodyard." [SOF ¶ 8].

The transfer did not go forward. [SOF ¶ 19]. If it had gone forward, the transfer would not have affected Willitts' salary. [Id. ¶ 19]. The parties dispute whether the transfer would have required Willitts to do work outside of the scope of his current position or to get a separate license. Willitts' original offer letter for his Equipment Operator position stated that one of his responsibilities may include "[o]perat[ing] wood yard equipment and computer system as needed." [Id. ¶ 3]. The parties also dispute whether the proposed transfer would have been temporary or considered a demotion.

Finally, the parties dispute the basis for the written warning and proposed transfer. Specifically, they dispute whether Willitts' supervisors and colleagues complained to Manning about Willitts' argumentativeness and told Manning they no longer wanted to work with Willitts.

v.   Willitts' Relationship with ENGIE after September 9, 2016

Shortly after this meeting, Willitts began a leave of absence due to mental health issues, including stress, anxiety, and depression.  [SOF ¶ 21].  Willitts was approved for 12 weeks of leave pursuant to the Family and Medical Leave Act ("FMLA"), which ran from mid-September 2016 to December 2016.  [Id. ¶ 22].

The parties dispute whether, in December 2016, Willitts was terminated or continued to be employed while remaining on medical leave.  Willitts believed he was terminated by ENGIE or "going to be terminated" in December 2016, [ECF No. 173 at 2; SOF ¶ 23], and says he was "treated as if he was terminated[,]" [ECF No. 173 ¶ 42].  More specifically, on December 1, 2016, he received an email from Amanda Applin, in ENGIE Human Resources, stating that he was expected "to provide a return to work notice from [his] physician by close of business Tuesday, December 6, 2016."  [ECF No. 168-4 (Dec. 1, 2016 email from A. Applin to J. Willitts)].  It further stated that "[t]he notice from [his] physician would need to state [his] ability to return to work with 100% clearance, no restrictions."  [Id.].  It went on that if he was "unable to furnish the physician's return to work/fitness for duty by the aforementioned deadline, the Company will terminate [his] employment."  [Id.].  Finally, the email noted that "[u]pon which time you are medically able to return to work with medical clearance, we may consider discussing terms [of] your reinstatement."  [Id.].

Following this email, no one from ENGIE told Willitts his employment was terminated. [SOF ¶ 25].

On January 8, 2017, Willitts sent an email to several ENGIE employees, in which he stated that he was "unable to return to work at this time."  [SOF ¶ 27].  He noted that in addition to his depression and anxiety, he had recently had eye surgery, and had been instructed "not to be

exposed to any dust and debris in [his] environment."  [Id.; ECF No. 168-2 (Jan. 8, 2017 email from J. Willitts to S. Cedroni and others) at 5].

On January 9, 2017, counsel representing Willitts emailed several ENGIE employees, stating that they were forwarding some "correspondence" and requested that ENGIE "hold off on making any employment decisions with respect to [Willitts]" until they reviewed that information.  [SOF ¶ 28].

On January 16, 2017, Frank Dobrinski, an ENGIE Human Resources employee, responded to Willitts' January 8, 2017 email.  [SOF ¶ 29; ECF No. 168-3 (Jan. 16, 2017 email from F. Dobrinski to J. Willitts and others)].  In the email, Dobrinski asked Willitts to call him to discuss his options.  [Id.].  Dobrinski noted that Willitts' short-term disability ("STD") had been denied and that his FMLA leave had expired.  [Id.].

On January 20, 2017, Willitts' counsel sent correspondence to ENGIE.  [ECF No. 173-31 (Jan. 20, 2017 letter from A. Cohen to F. Dobrinski)].  The cover letter described an attached November 23, 2016 letter from a medical provider that stated that Willitts "would not be able to return to the 'hostile work environment' until after January 1, 2017."  [Id. at 4].  The cover letter also stated that "Mr. Willitts [was] looking to conclude his employment with the Company[.]"  [Id. at 6].

On February 2, 2017, Dobrinski wrote to Willitts again, stating that they needed to "discuss [his] options[.]"  [ECF No. 168-3].  He explained that because Willitts' STD had been denied, and his FMLA exhausted, and he had still not returned to work, he was "in an unexcused absence, unpaid absence category that [could not] continue."  [SOF ¶ 30].

On March 24, 2017, Willitts filed a claim with the Massachusetts Commission Against Discrimination ("MCAD").  [SOF ¶ 31].  In that complaint, he stated that he took FMLA

beginning September 12, 2016, and then applied for STD, which was approved for two weeks, through September 29, 2016.  [ECF No. 168-5 (Mar. 24, 2017 MCAD Charge) at 2].  He went on to explain that after that, ENGIE asked him to provide "a cleared to work letter[,]" but his "physician did not believe that [he] was able to return to work and indicated so to [ENGIE]." [SOF ¶ 31].  Finally, he noted that "[t]o date, [he] ha[d] not heard anything from [ENGIE] regarding [his] employment."  [Id.].  In response to a June 9, 2017 filing by ENGIE, Willitts filed a "Statement of Facts" that said he was "still employed by ENGIE" but "still unable to work as a result of [his] disability, without an accommodation."  [Id. ¶ 33].

On June 19, 2017, Willitts emailed employees of CIGNA, ENGIE's administrator of Willitts' STD claim, asking about the approval of his STD claim, which he indicated had been delayed by CIGNA, and noting that he was "[s]till on Medical Leave with ENGIE."  [ECF No. 168-6 (June 30, 2017 email from J. Willitts to S. Verge and others) at 3; SOF ¶ 32].  On June 30, 2017, he sent a follow-up email to CIGNA, again noting that he was "still out [o]n unpaid medical leave with ENGIE."  [SOF ¶ 32].

On August 3, 2018, Willitts filed a complaint with the Massachusetts Attorney General's Office.  [ECF No. 168-8].  In the complaint, Willitts stated that he had been "out of work for 23 months without pay on a disability Leave."  [SOF ¶ 34].

On December 27, 2018, Craig Woolcott, Vice President, ENGIE Human Resources, sent a letter on behalf of ENGIE, informing Willitts of "the decision to terminate [his] employment effective December 27, 2018 for job abandonment."  [SOF ¶ 35; ECF No. 168-9].

> vi.     Willitts' Work Since September 2016 and Application for Worker's Compensation

All told, Willitts did not work from September 2016 to 2018.  [SOF ¶ 38].  In late 2018 and 2019, Willitts had his own plumbing business.  [Id. ¶ 39].  He stopped this work in 2019 due

to an unrelated lawsuit that exacerbated his medical conditions and has not worked since.  [Id.].

On August 20, 2020, Willitts filed a claim for worker's compensation benefits.  [SOF ¶ 41].  In his application, he indicated that he suffered from "[t]otal, temporary incapacity," from September 10, 2016 to the time of his application, August 20, 2020.  [Id.].  Willitts explained at his deposition that he "didn't understand" this to be a claim of total disability when he filed the worker's compensation claim, but also confirmed that he spoke to an attorney before filing it.  See [id. ¶¶ 42, 43; ECF No. 168-1 (Excerpts of Willitts Dep.) at 210:16–211:11].  Although he filed the application, Willitts did not "pursue it[,]" [ECF No. 168-1 (Excerpts of Willitts Dep.) at 202:10–20, 207:15–208:6], and there is no evidence that he ever received any worker's compensation benefits.

In May 2017, in the context of Willitts' application for long-term disability leave, several medical providers evaluated Willitts' ability to return to work at ENGIE.  In responding to the question "What specific activities or tasks is your patient unable to perform to impact their ability to work?" one provider responded that Willitts was "[n]o longer able to be in a plant work setting due to lack of ability to function in a large organization that may be perceived as hostile."  [ECF No. 173-22 (CIGNA Behavioral Health Questionnaire) at 10].  The provider further noted Willitts "[c]annot return to work in plant setting with highly stressful job requiring quick decision making."  [Id.].  Finally, the provider concluded that Willitts "cannot perform in prior work setting" and "can start to perform in his own business setting where he can control stress levels."  [Id. at 11].

At his deposition, Willitts acknowledged that health care providers told him he was unable to work with or without accommodation.  [SOF ¶ 36; ECF No. 168-1 (Excerpts of Willitts Dep.) at 211:17–22].  Willitts also acknowledged that he would "find it difficult" to

work for an employer, and does not "know if [he] would be able to be employed." [ECF No. 168-1 (Excerpts of Willitts Dep.) at 204:16-205:4]; see also [SOF ¶ 37 (explaining that Willitts has been unable to work for any employer since the start of his leave)]. According to Willitts, since September 2016 the "only way" he could work, was to work for himself. [SOF ¶ 39; ECF No. 168-1 (Excerpts of Willitts Dep.) at 196:20–197:1]. Willitts further explained that he could work for himself because it gave him "control" over what he did. [SOF ¶ 40]. He also suggested that he may be able to work for an employer now, if he was given an accommodation that ensured the job was "not stressful." [Id.].

### C.    Procedural Background

Willitts initiated this action on June 30, 2020. [ECF No. 1]. On December 29, 2020, he filed the operative, six-count complaint, bringing claims for (1) abuse of power (Count I), [Am. Compl. at 5–7]; (2) breach of confidentiality (Count II), [id. at 7–9]; (3) "civil rights action" (Count III), [id. at 9]; (4) intentional infliction of emotional distress ("IIED") (Count IV), [id. at 9–10]; (5) invasion of privacy (Count V), [id. at 10–11]; and (6) "discrimination" (Count VI), [id. at 11–12]. Although not entirely clear from Willitts' pleadings, the Court interpreted Willitts' "discrimination" count as raising claims under the ADA, the Health Insurance Portability and Accountability Act ("HIPAA"), the FMLA, Massachusetts General Laws Chapter 151B, § 4, and the Age Discrimination in Employment Act. [Am. Compl. at 11–12; ECF No. 27]. ENGIE moved to dismiss the complaint in its entirety on January 19, 2021. [ECF No. 17]. On June 7, 2021, the Court granted ENGIE's motion to dismiss all claims, except his ADA claim. [ECF No. 27].

Following a period of discovery, on July 29, 2022, ENGIE moved for summary judgment. [ECF No. 165]. Willitts opposed the motion on September 21, 2022, [ECF No. 173],

ENGIE replied on October 5, 2022, [ECF No. 174], and Willitts filed a sur-reply on October 14, 2022, [ECF No. 176].

## II.       LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (alteration in original) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)) (further citation omitted).  "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted).  By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case." United States v. Plat 20, Lot 17, 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

> To succeed in showing that there is no genuine dispute of material fact, the moving party must . . . "affirmatively produce evidence that negates an essential element of the non-moving party's claim," or, using "evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial."

Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (second alteration in original) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002)

(citation omitted).  That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact."  Plat 20, Lot 17, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)) (further citation omitted).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted).  The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial."  Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material."  Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012) (citation omitted).  "Trialworthiness necessitates 'more than simply show[ing] that there is some metaphysical doubt as to the material facts.'"  Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (alteration in original) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)); see Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient . . . .").

"'On issues where the nonmovant bears the ultimate burden of proof, [it] must present definite, competent evidence to rebut the motion' for summary judgment."  Pleasantdale Condominiums, LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) and citing Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)).  The Court may discount "conclusory allegations, improbable inferences, and unsupported speculation."  Cochran, 328 F.3d at 6 (quoting Medina-Muñoz, 896 F.2d at 8). "Evidence that is 'conjectural or problematic' will not suffice to forestall summary judgment."

Wakefield, 37 F.4th at 733 (quoting Mack v. Great Atl. and Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)).

## III.      DISCUSSION

"The ADA prohibits discrimination in employment against qualified persons with a disability." Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002) (citing 42 U.S.C. § 12112(a)). As defined by the ADA, as relevant here, discrimination includes taking an adverse employment action against a qualified individual because of the individual's disability, see Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005), as well as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee[.]" Carroll, 294 F.3d at 237 (quoting 42 U.S.C. § 12112(b)(5)(A)).

The Court understands Willitts to be advancing two theories of discrimination under the ADA: first, that ENGIE took "adverse employment actions" against him because of his disabilities, and, second, that ENGIE failed to reasonably accommodate his disabilities. At summary judgment, courts evaluate both claims under the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see Tobin, 433 F.3d at 104–05. Step one requires that Willitts establish a *prima facie* case of discrimination, which itself has three elements. Tobin, 433 F.3d at 104. For both of Willitts' theories, Willitts must prove that: (1) he has a disability, within the meaning of the ADA, and (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation (a "qualified individual," within the meaning of the ADA). Id. at 104, 107 n.5. As to the third element, for the adverse employment actions claim, he must show that ENGIE took an "adverse employment action" against him because of, in whole or in part, his protected

disability.  Id. at 104.  For the failure to accommodate claim, he must show that despite knowing of Willitts' disability, ENGIE failed to "reasonably accommodate" it.  Id. at 107.

If Willitts makes this showing, the burden then shifts to the employer to "articulate a legitimate, non-discriminatory reason for its employment decision" or failure to reasonably accommodate, and "to produce credible evidence to show that the reason advanced was the real reason."  Tobin, 433 F.3d at 105–07 (citation omitted).

Finally, "if [ENGIE] offers such a reason, the burden shifts back to [Willitts], and he must proffer evidence to establish that [ENGIE's] non-discriminatory justification is mere pretext, cloaking discriminatory animus."  Tobin, 433 F.3d at 105 (citation omitted).

ENGIE argues it is entitled to summary judgment for several reasons.  First, ENGIE avers that Willitts has not presented sufficient evidence to establish his *prima facie* case under either of his two theories.  [ECF No. 166 at 5–7].  Specifically, as relevant to both theories, ENGIE asserts that Willitts cannot show he is a "qualified individual," within the meaning of the ADA.  [Id. at 7–11].  As to his failure to accommodate claim, ENGIE argues that Willitts cannot show that ENGIE failed to reasonably accommodate him.  [Id. at 11–14].  And finally, as to his adverse employment actions claim, ENGIE avers that Willitts cannot show that ENGIE's conduct constitutes "adverse employment actions" within the meaning of the ADA,[2] [id. at 14–15], and that, even if he could make out a *prima facie* case for his adverse employment actions claim, he has failed to present evidence that ENGIE's proffered reasons for taking the challenged action is pretextual and motivated by discriminatory animus.  [Id. at 15–20].

---

[2] "For the limited purpose of this Motion," ENGIE does not dispute that Willitts had a disability, as defined in the ADA.  [ECF No. 166 at 5 n.3].

As discussed further below, the Court finds that Willitts has not presented competent evidence to establish his *prima facie* case of discrimination for either of his claims.  Therefore, ENGIE's motion for summary judgment must be <u>GRANTED</u>.

**A.      Scope of Willitts' claims**

Before addressing the elements of Willitts' *prima facie* case, the Court again begins by addressing a threshold matter—that is, the scope of the conduct relevant to Willitts' claims.  At the motion to dismiss stage, the Court understood Willitts' adverse employment actions claim to relate to the September 2016 proposed transfer, or demotion, prompted by the written warning, and his failure to accommodate claim to allege that ENGIE failed to reasonably accommodate Willitts' known disability when it failed to provide him a short-term medical leave beginning sometime after September 2016.  [ECF No. 27 at 15].

ENGIE notes that Willitts raised, for the first time at his deposition, an additional basis for his adverse employment actions claim—that is the May 2016 shift realignment placed him on shift with supervisor  O'Rourke, which Willitts alleges was made by Manning "intentionally" with knowledge of Willitts' disability.  <u>See</u> [ECF No. 166 at 16 n.5; SOF ¶ 47; ECF No. 168-1 (Excerpts of Willitts Dep.) at 289:1–290:23].  Willitts further testified that after the realignment he requested to be removed from shifts with O'Rourke, as an "accommodation," and that that request was denied.  [ECF No. 168-1 (Excerpts of Willitts Dep.) at 289:1–290:23].  Willitts' opposition brief also references this shift change, his requests to be removed from O'Rourke's shifts, both before and after the shift realignment, and the denial of those requests.  [ECF No. 173 ¶¶ 3, 37, 39].  It appears that Willitts is now alleging that this conduct is relevant to both of his claims, and the Court must therefore determine whether to consider these broader versions of Willitts' claims in assessing his claims at the summary judgment stage.

"Individuals asserting discrimination or failure to accommodate claims under the ADA are required to file an administrative charge with the EEOC, or alternatively, with an appropriate state or local agency, prior to commencing a civil action." Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 55–56 (1st Cir. 2019) (citation omitted).  Individuals are required to file these charges within 300 days of the alleged unlawful employment practice.  See Brader v. Biogen Inc., 983 F.3d 39, 60 (1st Cir. 2020); see also 42 U.S.C. § 2000e-5.  Willitts filed his charge with the MCAD on March 24, 2017, [SOF ¶ 31], which means that any unlawful employment practice must have occurred no earlier than May 28, 2016.  Willitts received notice of the shift change on May 16, 2016.  [SOF ¶ 48].  His request to be removed from O'Rourke's shift following realignment was denied on or before May 24, 2016, [ECF No. 173 ¶ 23], and his other requests to not work on shift with O'Rourke occurred sometime before May 2016.  [Id. ¶ 3, 18].  Claims related to this conduct would therefore appear to be time-barred.  That said, "[c]ourts have recognized a narrow exception to the limitations period via the 'continuing violation doctrine.'" Ayala v. Shinseki, 780 F.3d 52, 57 (1st Cir. 2015) (citing Pérez–Sánchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008)).  Under the continuing violation doctrine, "a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act [(often called an 'anchoring act')] fell within the limitations period." Brader, 983 F.3d at 61 (alteration in original) (citations omitted).

> However, this doctrine does not apply to "discrete acts" of alleged discrimination that occur on a "particular day." Instead, it applies only to claims that cannot be said to occur on a particular day and that by their very nature require repeated conduct to establish an actionable claim, such as hostile work environment claims. The continuing violation doctrine simply "allow[s] suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought."

Ayala, 780 F.3d at 57 (alteration in original) (quoting Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009) and then quoting Morales–Tañon v. P.R. Elec. Power Auth., 524 F.3d

15, 19 (1st Cir. 2008)) (further citation omitted).  "[D]iscrete discriminatory acts are not

actionable if time barred, even when they are related to acts alleged in timely filed charges."

Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 33 (1st Cir. 2009) (quoting Nat'l Railroad

Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)) (further citation omitted).

The First Circuit has held that "*the denial of a reasonable accommodation*, the failure to

renew a contract, *a change of supervisor*, a relocation to another floor, a transfer to another

office, and the failure to assign work to an employee . . . constitute discrete acts." Ayala, 780

F.3d at 57 (emphasis added) (citing Thornton, 587 F.3d at 30, 33–34, Ruiz–Sulsona v. Univ. of

P.R., 334 F.3d 157, 160 (1st Cir. 2003), and Rivera v. P.R. Aqueduct and Sewers Auth., 331 F.3d

183, 186–89 (1st Cir. 2003)).  "Similarly, a negative performance evaluation, transfer to another

area, and letter of warning also constitute discrete acts." Id. (citing Miller v. N.H. Dep't of Corr.,

296 F.3d 18, 21–22 (1st Cir. 2002)) (further citation omitted).  Thus, even assuming the May 16,

2016 shift realignment and the September 2016 conduct were related, because each was a

"discrete act," the continuing violation doctrine does not apply.  Therefore, because Willitts filed

his MCAD charge over 300 days after receiving notice of the May 2016 shift realignment, any

adverse employment action claims related to that shift realignment are time-barred.  Similarly,

any failure to accommodate claims related to the denial of Willitts' requests to not work with

O'Rourke, both on May 24, 2016 and before, are also time-barred.

Arguably, given that Willitts missed the filing deadlines by only a few days and the fact

that he is *pro se*, the Court could nonetheless elect to consider the May 24, 2016 denial on its

merits.  Here, however, Willitts gave no indication in his complaint or in any timely manner

thereafter that he intended to include this claim.  Additionally, Willitts' request to not work with

O'Rourke cannot reasonably be construed as a request for a reasonable accommodation for

Willitts' disability under the circumstances presented here.[3]  The Court therefore will not consider any failure to accommodate claim related to the denial of Willitts' requests to not work with O'Rourke.

In summary, the Court evaluates Willitts' adverse employment actions claim as challenging the September 2016 written warning and proposed transfer, and his failure to accommodate claim to challenge ENGIE's alleged failure to provide him a reasonable medical leave after September 2016.

### B.   Qualified Individual

ENGIE asserts that Willitts has not been "qualified" to work for an employer, other than himself, since his leave from ENGIE began in September 2016.  See [ECF No. 166 at 7–8]. ENGIE bases this on Willitts' own statements in two contexts.  [Id. at 8–11].  First, in his August 2020 worker's compensation application, Willitts stated that he was totally disabled from

---

[3] While Willitts describes this and other requests as "accommodations or modifications," see, e.g., [ECF No. 173 ¶ 18], these conclusory statements are insufficient to establish them as requests for reasonable accommodations for Willitts' disability.  "[An] employee's request must be sufficiently direct and specific, giving notice that she needs a special accommodation."  Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001) (citations and internal quotation marks omitted).  "At the least, the request must explain how the accommodation requested is linked to some disability . The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace."  Id. (citation omitted); see also Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012) ("The obligation is on the employee to provide sufficient information to put the employer on notice of the need for accommodation . . . . This means not only notice of a condition, but of a causal connection between the major life activity that is limited and the accommodation sought." (citations and internal quotation marks omitted)).  Here, Willitts detailed the reasons he gave Manning for not wanting to work with O'Rourke, [ECF No. 173 ¶ 18], and these reasons made no reference to, or drew any "causal connection" to, his disability. Considering his failure to accommodate claim as related to the May 24, 2016 denial would therefore be an empty exercise.  See Reed, 244 F.3d at 260 ("We need not concern ourselves with the reasonableness of [plaintiff's] accommodation, however, because [plaintiff] has failed to prove another essential element of her burden: that she ever sufficiently requested the accommodation in question.").

September 19, 2016 through August 2020.  [Id. at 8–9].  Second, at his deposition, Willitts acknowledged that he has not been able to work for any employer since September 2016, and would find it difficult to work for any employer.  [Id. at 9–11].  ENGIE argues that these statements preclude his claim that he could work with reasonable accommodations.  ENGIE also argues that Willitts has failed to propose a reasonable accommodation that would allow him to work for an employer.  [Id. at 10–11].  Willitts responds in his sur-reply that he is a "qualified" individual.  [ECF No. 176 at 6].  He further states that he had a "temporary medical problem" that was exacerbated by ENGIE's actions, including his wrongful termination in December 2016, which turned his "temporary condition" into a "long term condition."  [Id.].

"Under the ADA, a 'qualified individual' is 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . .'"  Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 27 (1st Cir. 2019) (quoting 42 U.S.C. § 12111(8)).  "For each of [his] ADA claims, [Willitts] must establish that he was a 'qualified individual' at the time of [the alleged adverse action]."  Thompson v. Gold Medal Bakery, Inc., 989 F.3d 135, 141 (1st Cir. 2021) (citing 42 U.S.C. § 12112(a), (b)(5)(A)). This analysis typically proceeds "in two steps: first, whether the individual can perform the essential functions of her position; and second, if she is unable to perform those essential functions, whether any reasonable accommodation by her employer would allow her to do so." Phelps v. Optima Health, Inc., 251 F.3d 21, 25 (1st Cir. 2001) (citation omitted).

i.      Adverse Employment Actions Claim

As to Willitts' adverse employment actions claim, the Court finds that Willitts was a "qualified individual" when he received the written warning and proposed transfer on September 9, 2016.  His previous performance review was favorable, and, in fact, he had been found to

"Exceed[] Expectations."  [2015 Performance Appraisal at 4].  The September 2016 written warning may suggest that Willitts was having issues with performance, but it recommended a transfer rather than a termination.  [SOF ¶ 8].  Thus, ENGIE seemingly did not believe he was so unfit for his position or any other that he could not perform its essential functions.  See Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 76 (1st Cir. 2010) ("The ADA expressly provides that 'consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.'" (quoting 42 U.S.C. § 12111(8))).  Further, while Willitts has the ultimate burden of proving he was a qualified individual, "[i]t is the employer's burden 'to come forward with some evidence' that a particular function is essential[.]"  Id. (quoting Tobin, 433 F.3d at 107).  ENGIE's arguments all focus on the time period after Willitts went on leave in September 2016, and the only essential function ENGIE explicitly references is "attendance."  See [ECF No. 166 at 10].  There is no evidence showing that Willitts was not performing this function (or any other essential function) prior to September 9, 2016.  The Court therefore finds, "indulging all reasonable inferences in [Willitts'] favor[,]" Cochran, 328 F.3d at 6, that Willitts has met his burden to show that he was a "qualified individual" for purposes of his adverse employment actions claim.

      ii.      Failure to Accommodate Claim

On the other hand, as to Willitts' Failure to Accommodate claim, the Court finds that Willitts has not presented "definite, competent evidence," Pleasantdale Condominiums, 37 F.4th at 733, showing that he could perform the essential functions of his role at ENGIE, with or without accommodation, after leaving ENGIE in September 2016.

It is undisputed that Willitts stopped working in September 2016.  See [SOF ¶¶ 21, 22].

The First Circuit has made clear that "attendance is an essential function of any job."  Rios-

Jimenez v. Principi, 520 F.3d 31, 42 (1st Cir. 2008) (citing Waggoner v. Olin Corp., 169 F.3d

481, 485 (7th Cir. 1999) ("an employee who does not come to work cannot perform the essential

functions of his job")) (further citations omitted).  All jobs may not require physical presence,

but Willitts' position, which involved operating and maintaining physical equipment, clearly did.

Willitts has therefore failed to show that he could perform an essential function of his position as

of September 2016.  See Manning v. Abington Rockland Joint Water Works, 357 F. Supp. 3d

106, 119–20 (D. Mass. 2019) ("It is clear from the record that to perform the essential functions

of the office clerk position with the Water Works, the clerk should be physically present in the

office.  [Plaintiff] points to no evidence to show that, without accommodation, [plaintiff] had the

ability to be present in the office for even half the work days in a given year.  Thus, it is clear

that [plaintiff] could not perform the essential functions of her job without a reasonable

accommodation.").

As to the second step of the analysis, Willitts has also failed to present evidence that a

reasonable accommodation would have allowed him to perform the essential functions of his

position.  Willitts asserts in his sur-reply that if ENGIE had not terminated him in early

December 2016, as he alleges, his condition would not have been exacerbated, and he would

have been able to return to work shortly thereafter.  [ECF No. 176 at 6].  Willitts also states that

documents had been sent to ENGIE with a scheduled date for his return, though he does not

attach those documents for the Court's review.  [Id.].  It is possible that Willitts is referencing a

November 23, 2016 letter from a medical provider that states that "he would not be able to return

to the 'hostile work environment' until after January 1, 2017."  [ECF No. 173-31 at 4].  The

Court finds this is not competent evidence for several reasons. First, Willitts' assertions that he would have been able to return, but for ENGIE's alleged conduct, are speculative and conjectural. See Cochran, 328 F.3d at 6; Pleasantdale Condominiums, 37 F.4th at 733. Second, it is true that "a leave of absence and leave extensions are reasonable accommodations in some circumstances," Fiumara v. President and Fellows of Harvard Coll., 526 F. Supp. 2d 150, 157 (D. Mass. 2007) (citing Garcia–Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647–48 (1st Cir. 2000) (further citation omitted)), aff'd, 327 F. App'x 212 (1st Cir. 2009), but "[a]n open-ended or indefinite leave extension, however, is not reasonable[,]" id. (citing Watkins v. J & S Oil Co., 164 F.3d 55, 61–62 (1st Cir. 1998)) (further citation omitted). The November 23, 2016 letter indicates only that Willitts would not be able to return until after January 1, 2017, precisely the sort of "indefinite" leave extension that courts have found unreasonable. See id. What is more, Willitts does not dispute that as of his January 8, 2017 email to ENGIE, he was still not able to return to work, or provide a date for when he could return.

Further, as ENGIE notes, in his August 2020 worker's compensation application, Willitts claimed to be totally disabled as of September 19, 2016. He also acknowledged at his deposition that he has not worked for an employer since the same date and would find it difficult to work for any employer. Willitts' speculation that he would have been able to work for an employer if ENGIE had not terminated him in December 2016 is insufficient to overcome this evidence. See Sullivan v. Raytheon Co., 262 F.3d 41, 47 (1st Cir. 2001) ("[T]o defeat [the employer's] motion for summary judgment, [the employee] must explain why the representations of total disability he has made in the past are consistent with his current claim that he could perform the essential functions of [his position] with reasonable accommodation." (citing Cleveland v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 798 (1999))).

Finally, to the extent that Willitts contends he could work for an employer with an accommodation that ensured the job would not be stressful, courts have found that such an accommodation is unreasonable as a matter of law.  See, e.g., Marino v. U.S. Postal Serv., 25 F.3d 1037 (1st Cir. 1994) (unpublished table decision) ("[Plaintiff] suggests as a reasonable accommodation that he be protected from stress- producing situations at work.  Such an accommodation, however, has been deemed unreasonable as a matter of law." (citing Pesterfield v. Tenn. Valley Auth., 941 F.2d 437, 442 (6th Cir. 1991))); Manning, 357 F. Supp. 3d at 122 ("[A] proposed accommodation, which essentially amounts to making a busy workplace a stress-free environment, or at least one in which [plaintiff] is shielded from negative feedback, 'is an unreasonable accommodation as a matter of law.'" (quoting Grillasca-Pietri v. Portorican Am. Broad. Co., 233 F. Supp. 2d 258, 264 (D.P.R. 2002))).

Willitts' failure to present evidence controverting ENGIE's evidence that Willitts could not perform in his position, with or without accommodation, is "fatal" to his claim.  See Manning, 357 F. Supp. 3d at 119 ("[Plaintiff's] failure to respond [to movant's adverse evidence] or point to any evidence in support of the proposition that she could, in fact, perform the essential functions of the job (with or without an accommodation) is fatal to her failure to accommodate claim.").  Because Willitts cannot make out a *prima facie* case of discrimination for his failure to accommodate claim, summary judgment must enter for ENGIE on this claim.

### C.    Adverse Employment Actions

ENGIE next argues that Willitts also cannot establish that it took an "adverse employment action" against Willitts because of his disabilities.  Specifically, ENGIE avers that the written warning and proposed transfer are not "adverse employment action[s]" because they were not "materially adverse" and did not "carry tangible consequences" to Willitts'

employment." [ECF No. 166 at 14 (citing Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 73 (1st Cir. 2011))].  The Court agrees.

"To be adverse, an action must materially change the conditions of plaintiffs' employ." Gu v. Bos. Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002) (citations omitted).  "Generally, an adverse employment action involves a discrete change in the terms and conditions of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'"  de Jesus v. Potter, 211 Fed. App'x 5, 9 (1st Cir. 2006) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (further citation omitted).  "While a reprimand may constitute an adverse action, it must carry with it tangible consequences in addition to correcting some workplace behavior that management perceived as needing correction."  Abouhamad v. Bank of Am., Corp., No. 10-cv-11133, 2012 WL 4023579, at *6 (D. Mass. Sept. 11, 2012) (citing Bhatti, 659 F.3d at 73) (further citation omitted).  The same is true for a proposed transfer.  Demotions and "disadvantageous transfers or assignments . . . may constitute adverse employment action[s], subject to the facts of a particular case."  Colon-Fontanez v. San Juan, 660 F.3d 17, 37 (1st Cir. 2011) (citations and internal quotation marks omitted).  Where a proposed transfer does not occur, however, it does not constitute a material change to a person's employment.  See West v. Potter, 540 F. Supp. 2d 91, 96 (D.D.C. 2008) (finding a "proposed transfer was not an adverse employment action" because "an employee faced with a threatened employment action does not suffer a cognizable injury from an action that does not occur." (citing Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002))) (further citation omitted).  The evidence here shows that the written warning may have ultimately led to a transfer, but because the evidence establishes that the transfer did not occur, neither the warning nor the proposed transfer had a material impact on

Willitts' employment.  As such, neither constitutes an "adverse employment action" for purposes of a discrimination claim.  Gu, 312 F.3d at 14.

The Court therefore finds that Willitts has not established a *prima facie* case of discrimination for his adverse employment actions claim, and summary judgment must therefore also enter for ENGIE on this claim.  The Court need not address ENGIE's remaining arguments.

**IV.     CONCLUSION**

ENGIE's motion for summary judgment, [ECF No. 165], is GRANTED.

**SO ORDERED.**

March 20, 2023                                                    /s/ Allison D. Burroughs
                                                                            ALLISON D. BURROUGHS
                                                                            U.S. DISTRICT JUDGE